KELLUM, Judge.
James Ben Brownfield appeals the circuit court's denial of his petition for postconviction relief filed pursuant to *784 Rule 32, Ala. R. Crim. P., in which he attacked his capital-murder convictions and sentence of death.
Facts and Procedural History
In 2004, Brownfield was convicted of three counts of capital murder in connection with the murders of his sister, Brenda McCutchin ("Brenda"), his brother-in-law, Latham McCutchin ("Latham"), and Brenda's three-year-old grandson, Joshua Hodges ("Joshua"). Specifically, Brownfield was convicted of murdering Latham during the course of a burglary, see § 13A-5-40(a)(4), Ala. Code 1975, of murdering Latham, Brenda, and Joshua during one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala. Code 1975, and of murdering Joshua, who was under 14 years of age, see § 13A-5-40(a)(15), Ala. Code 1975. By a vote of 11-1, the jury recommended[1] that Brownfield be sentenced to death for his capital-murder convictions. The trial court followed the jury's recommendation and sentenced Brownfield to death. This Court affirmed Brownfield's convictions and sentence on direct appeal, Brownfield v. State, 44 So.3d 1 (Ala. Crim. App. 2007), the Alabama Supreme Court affirmed this Court's judgment, Ex parte Brownfield, 44 So.3d 43 (Ala. 2009), and the United States Supreme Court denied certiorari review, Brownfield v. Alabama, 562 U.S. 1003, 131 S.Ct. 505, 178 L.Ed.2d 370 (2010). This Court issued a certificate of judgment on May 26, 2010.
The facts of the case were set out in this Court's opinion on direct appeal:
"The trial court set out the following statement of the evidence, which we adopt:
" 'At some time in the late evening hours of December 23, 2001, or the early morning hours of December 24, 2001, Brenda Whitehead McCutchin, Joshua Dewayne Hodges, and Latham Durwood McCutchin were murdered in their homes in Scottsboro, Alabama. At the time of their deaths, Brenda was forty-seven years old, Joshua was three years old, and Latham was sixty-four years old.
" 'After consuming Xanax pills on the night of December 23, 2001, the twenty-seven year old defendant, James Ben Brownfield, Jr., became enraged with his sister, Brenda Whitehead McCutchin, over drugs and money. While Brenda and her grandson, Joshua Dewayne Hodges, were sleeping in their bed, the defendant decided to kill his sister and her estranged husband, Latham Durwood McCutchin. The defendant took a claw hammer into the room where Brenda and Joshua were sleeping and hit Brenda with it. When the defendant hit Brenda, Joshua awoke crying. At that time, the defendant began hitting both Brenda and Joshua with the claw hammer. Brenda suffered approximately twenty forceful blows to the head and other injuries to her body. Joshua suffered approximately sixteen blows to the head and other injuries to his body. Both Brenda and Joshua died from multiple blunt-force injuries. Before he left Brenda's house, the defendant attempted to burn the house with kerosene and a cigarette.
" 'After killing Brenda and Joshua, the defendant took the claw hammer and a set of clean clothes and drove across town to the residence of his *785 brother-in-law, Latham Durwood McCutchin. The defendant initially pretended a friendly visit with Latham but later inside the residence, the defendant informed Latham that he was going to kill him. The defendant and Latham struggled for the claw hammer with the defendant subduing Latham by hitting him with his fists and the hammer. Latham suffered numerous injuries. He suffered at least ten forceful blows to the head with the claw hammer, bruising to the lower chest, arms, and hands, fractured ribs and a fractured vertebra. Later, the defendant stabbed Latham in the heart and cut his throat with a knife. Latham died from multiple blunt-force injuries. After killing Latham, the defendant showered and dressed in the clean clothes. He gathered the soiled clothes, claw hammer, and knife and placed them in a garbage bag that he found at Latham's house.
" 'The defendant left Latham's house and went to a Christmas party where he saw friends and acquaintances. He told his friend, Nick Logan, that he was moving to Tennessee because he and Brenda had argued and she had kicked him out of the house. Later, the defendant left the party and drove toward Tennessee to Stevenson, Alabama. He placed the garbage bag of evidence in a dumpster in Stevenson and drove back to Scottsboro. The defendant had contact with friends throughout the day of December 24, 2001. The night of December 24, 2001, the defendant went to Tammy Farmer's apartment. During conversations with Tammy, his girlfriend, the defendant confessed to the murders of Brenda, Joshua, and Latham.
" 'Concerned about his father, Rodney McCutchin traveled to Latham McCutchin's house. Rodney and his son found the body of Latham and called 911. The Scottsboro Police Department immediately began an investigation into the death of Latham. During the investigation, they obtained information that implicated Brenda McCutchin and her brother, the defendant, James Ben Brownfield, Jr. On the morning of December 25, 2001, the Scottsboro Police Department obtained a search warrant to search the home of Brenda McCutchin. Upon searching the home, the police discovered the bodies of Brenda and her grandson, Joshua. The Scottsboro Police Department intensified their search for Brenda's car and the defendant.
" 'At approximately 10:00 A.M. on December 25, 2001, the Scottsboro Police Department located Brenda's car and the defendant at the apartment of defendant's girlfriend, Tammy Farmer. The defendant was apprehended and transported to the Scottsboro Police Department. On December 25 and 26, 2001, the defendant gave Investigators Robert Petty and Doug Hood of the Scottsboro Police Department a statement of confession to the murders.'
"(C. 345-347.) The trial court also noted that the evidence indicated that Brownfield wrote messages on the walls of both residences: At Latham's house Brownfield wrote 'This was necessary Ben. I'm sorry for your family. They deserved it.' (C. 351) and at Brenda's residence those messages were throughout the house and included comments such as ' "Fuck this God," "Fuck this world," "I'll be dead too," "It's about to pick up," "Don't look for me," "Tammy I love you Always Never 4-get Baby,"
*786 "Killing is my business," and "My whole life I have been ran over. It's stopping now." ' (C. 353.)
"The evidence further indicated that although Brenda McCutchin and Latham McCutchin were married, they were separated and no longer lived together, and that Brownfield lived with Brenda and Joshua at Brenda's house on Wallace Lane in Scottsboro. The evidence also indicated that the victims did not die immediately upon the striking of the first blows; rather, they survived for some period before succumbing to their injuries. Further, each of the victims had what were characterized as defensive wounds, indicating that they attempted to ward off at least some of the blows from the hammer. Finally, Brownfield presented evidence indicating that he had consumed seven or eight Xanax pills on the night of the murders and that he had also used crystal methamphetamine a number of times in the week preceding the murders."
Brownfield, 44 So.3d at 6-8 (footnote omitted).[2]
On February 14, 2011, Brownfield timely filed the instant Rule 32 petition, raising numerous claims, including claims of ineffective assistance of trial counsel and appellate counsel.[3] On October 3, 2011, the State filed an answer to Brownfield's petition. Brownfield filed an amended petition on January 9, 2012.[4] The State filed an answer to the amended petition on March 13, 2012, and a motion to dismiss the amended petition on April 25, 2012. Brownfield also filed several discovery requests, which the State responded to. After conducting a hearing on the State's motion to dismiss and Brownfield's discovery requests on July 22, 2012, the circuit court issued an order on October 9, 2012, summarily dismissing several of the claims in Brownfield's petition but ordering an evidentiary hearing on Brownfield's claims of ineffective assistance of trial counsel and appellate counsel and his claims of juror misconduct and prosecutorial misconduct.[5]
The evidentiary hearing was conducted over the course of five days in July and August 2013, and the circuit court permitted the parties to file post-hearing briefs. Brownfield filed his post-hearing brief on May 8, 2014. The State did not file a post-hearing brief but, instead, on July 21, 2014, filed what it styled as an "Answer to Post-Hearing Brief and Proposed Order on James Ben Brownfield's Amended Rule 32 Petition for Post-Conviction Relief." (C. 1045.) The State's answer was a single paragraph followed by a 127-page proposed *787 order. Brownfield filed a reply to the State's proposed order on August 27, 2014. On February 24, 2015, the circuit court adopted almost verbatim the State's proposed order as its final order denying Brownfield's petition. On March 18, 2015, Brownfield filed a written objection to the circuit court's adopting the State's proposed order. The circuit court did not specifically rule on Brownfield's written objection; therefore, that objection was deemed denied by operation of law 30 days after the circuit court's final order disposing of Brownfield's petition. See, e.g., Loggins v. State, 910 So.2d 146, 148-49 (Ala. Crim. App. 2005) (recognizing that postjudgment motions are permissible in Rule 32 proceedings but holding that a circuit court retains jurisdiction to modify a judgment in Rule 32 proceedings for only 30 days after the judgment is entered).
Standard of Review
"On direct appeal we reviewed the record for plain error; however, the plain-error standard of review does not apply to a Rule 32 proceeding attacking a death sentence." Ferguson v. State, 13 So.3d 418, 424 (Ala. Crim. App. 2008). See also Mashburn v. State, 148 So.3d 1094, 1104 (Ala. Crim. App. 2013).
" 'The burden of proof in a Rule 32 proceeding rests solely with the petitioner, not the State.' Davis v. State, 9 So.3d 514, 519 (Ala. Crim. App. 2006), rev'd on other grounds, 9 So.3d 537 (Ala. 2007). '[I]n a Rule 32, Ala. R. Crim. P., proceeding, the burden of proof is upon the petitioner seeking post-conviction relief to establish his grounds for relief by a preponderance of the evidence.' Wilson v. State, 644 So.2d 1326, 1328 (Ala. Crim. App. 1994). Rule 32.3, Ala. R. Crim. P., specifically provides that '[t]he petitioner shall have the burden of ... proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.' "
Wilkerson v. State, 70 So.3d 442, 451 (Ala. Crim. App. 2011).
"[W]hen the facts are undisputed and an appellate court is presented with pure questions of law, that court's review in a Rule 32 proceeding is de novo." Ex parte White, 792 So.2d 1097, 1098 (Ala. 2001). Also, "where a trial court does not receive evidence ore tenus, but instead makes its judgment based on the pleadings, exhibits, and briefs, ... it is the duty of the appellate court to judge the evidence de novo." Ex parte Horn, 718 So.2d 694, 705 (Ala. 1998). Likewise, when a trial court makes its judgment "based on the cold trial record," the appellate court must review the evidence de novo. Ex parte Hinton, 172 So.3d 348, 352 (Ala. 2012).
"However, where there are disputed facts in a postconviction proceeding and the circuit court resolves those disputed facts, '[t]he standard of review on appeal ... is whether the trial judge abused his discretion when he denied the petition.' " Boyd v. State, 913 So.2d 1113, 1122 (Ala. Crim. App. 2003) (quoting Elliott v. State, 601 So.2d 1118, 1119 (Ala. Crim. App. 1992) ). "When conflicting evidence is presented ... a presumption of correctness is applied to the court's factual determinations." State v. Hamlet, 913 So.2d 493, 497 (Ala. Crim. App. 2005). This is true "whether the dispute is based entirely upon oral testimony or upon a combination of oral testimony and documentary evidence." Parker Towing Co. v. Triangle Aggregates, Inc., 143 So.3d 159, 166 (Ala. 2013) (citations omitted). "The credibility of witnesses is for the trier of fact, whose finding is conclusive on appeal. This Court cannot pass judgment on the truthfulness or falsity of testimony or on the credibility of witnesses." Hope v. State, 521 So.2d 1383, 1387 (Ala. Crim. App. 1988). Indeed, *788 it is well settled that, in order to be entitled to relief, a postconviction "petitioner must convince the trial judge of the truth of his allegation and the judge must 'believe' the testimony." Summers v. State, 366 So.2d 336, 343 (Ala. Crim. App. 1978). See also Seibert v. State, 343 So.2d 788, 790 (Ala. 1977).
Analysis
I.
Brownfield first contends on appeal, as he did in his postjudgment objection, that the circuit court erred in adopting almost verbatim the State's proposed order as its final order disposing of his petition. Specifically, Brownfield argues that the circuit court's order contains the same typographical errors as did the State's proposed order-such as using the wrong names when referring to Brownfield and his trial counsel-which, he says, indicates that the court "failed to carefully and independently review the State's arguments and conclusions." (Brownfield's brief, p. 49.) Brownfield also argues that the order is "pervaded by the State's adversarial language," indicating, he says, that the findings and conclusions were not those of the circuit court. (Brownfield's brief, p. 50.)
"Alabama courts have consistently held that even when a trial court adopts verbatim a party's proposed order, the findings of fact and conclusions of law are those of the trial court and they may be reversed only if they are clearly erroneous." McGahee v. State, 885 So.2d 191, 229-30 (Ala. Crim. App. 2003). "[T]he general rule is that, where a trial court does in fact adopt the proposed order as its own, deference is owed to that order in the same measure as any other order of the trial court." Ex parte Ingram, 51 So.3d 1119, 1122 (Ala. 2010). Only "when the record before this Court clearly establishes that the order signed by the trial court denying postconviction relief is not the product of the trial court's independent judgment" will the circuit court's adoption of the State's proposed order be held erroneous. Ex parte Jenkins, 105 So.3d 1250, 1260 (Ala. 2012).
After thoroughly reviewing the record, we conclude that the circuit court's findings in this case were its own and were not merely an unexamined adoption of the proposed order submitted by the State. Unlike Ex parte Ingram, supra, in which the circuit court made patently erroneous statements that it had personal knowledge of the case and had " 'presided over Ingram's capital murder trial and personally observed the performance of both lawyers throughout Ingram's trial and sentencing,' " 51 So.3d at 1123 (citation and emphasis omitted), when, in fact, it had not, the circuit court's order here contains no such patently erroneous statements.[6] In addition, unlike Ex parte Scott, 262 So.3d 1266, 1274 (Ala. 2011), in which the circuit court adopted verbatim as its order the State's answer to the petition, which, "by its very nature, is adversarial and sets forth one party's position in the litigation," the court here adopted the State's proposed order, not the State's answer. "The 'adversarial tone' of the adopted order and the typographical errors contained in it do not, in and of themselves, establish that the circuit court's order ... was not the product of the court's own independent judgment." Van Pelt v. State, 202 So.3d 707, 723 (Ala. Crim. App. 2015).
Therefore, we find no error on the part of the circuit court in adopting verbatim the State's proposed order.
*789 II.
Brownfield also contends that the circuit court erred in denying his claim of juror misconduct. Specifically, Brownfield argues that Juror B.J. failed to disclose during voir dire that she had been the victim of a crime, thereby denying him a fair trial.
The record from Brownfield's direct appeal reflects that the venire was questioned in 4 panels of 15 prospective jurors each. After a lunch recess during the State's questioning of panel one, the prosecutor asked:
"Now, has anyone ever been interviewed by a policeman? And I'm not referring to just a traffic stop where they might have stopped you and asked you about your license and that kind of thing but something further than that where you either went to the police department or they might have come to your business or your home to interview you over a matter, you know, either as a possible suspect in something or as a witness about something. Now, has anyone ever talked to the police in that regard?"
(Record on Direct Appeal ("RDA"), R. 371.) The record indicates that two prospective jurors responded, but before those jurors could provide oral answers, the prosecutor asked if anyone had, over the lunch recess, thought of a question that had been asked earlier that they should have answered but did not. There was no response. The prosecutor then stated: "Now, we had a couple of responses about interviewing or talking to police at different times, and let's see who responded to that." (RDA, R. 372.) At that point, two prospective jurors again responded. One juror stated that he had been interviewed by police three to four weeks before voir dire as a possible witness to a string of robberies in an area where he had delivered appliances. Another juror stated that approximately three years before voir dire, the police had interviewed him regarding the whereabouts of his neighbor. When the prosecutor asked if "there was anyone else," no one responded. (RDA, R. 375.) The prosecutor then asked the following question: "I was asking you about personally whether you had been interviewed in some respect by a police officer or an investigator, but do you have a relative or a close friend that you know that has been interviewed or questioned by police?" (RDA, R. 375.) At that point a third juror responded, stating that he had been interviewed by police in 1996 when he "had some things stolen." (RDA, R. 375.) Juror B.J. did not respond to the prosecutor's questioning.
The record reflects that the prosecutor asked similar questions of the second panel and the fourth panel without using the words "witness" or "suspect" and that defense counsel asked panel three whether anyone had had any contact with law enforcement. A total of nine jurors responded to those questions; two of those jurors sat on Brownfield's jury, although neither had indicated that they had been the victim of a crime. Neither party directly asked panels one and two whether anyone had been the victim of a crime. Defense counsel did directly ask panels three and four whether anyone had been the victim of a crime, and six jurors responded affirmatively, one of whom sat on Brownfield's jury.
At the Rule 32 hearing, Brownfield presented evidence indicating that in September 2000, approximately three and a half years before his trial began, Juror B.J. had been interviewed by police after she had been the victim of a crime. Marty May, an investigator with the Jackson County Sheriff's Department, testified that in September 2000 he was the chief of *790 police of Pisgah, Alabama, and that he had interviewed Juror B.J. after it had been reported that food had been stolen from a freezer on Juror B.J.'s property. Inv. May testified that he did not remember who had reported the crime, nor could he recall whether he spoke with Juror B.J. at the police department or at Juror B.J.'s home. Inv. May stated that because the crime was a felony, he ultimately turned it over to the Jackson County Sheriff's Department. According to Inv. May, no arrests were made in relation to the incident, and the case was, at the time of the Rule 32 hearing, still open. Brownfield introduced into evidence the offense report from September 2000, which indicated that approximately $600 worth of food items had been stolen from Juror B.J.'s freezer. The report is signed by Juror B.J. and specifies the crimes as theft and burglary, although Inv. May testified that he did not remember the location of Juror B.J.'s freezer and that it was possible that there had been no burglary.
Richard Fricks, one of Brownfield's two trial attorneys and the attorney who conducted the majority of voir dire examination, testified at the Rule 32 hearing that during voir dire he had ranked prospective jurors from one to five, with one representing the most desirable juror, whom he "would want" to keep on the jury, and five representing the least desirable juror, whom he "would want" to strike from the jury. (R. 259.) Brownfield introduced into evidence Fricks's notes from voir dire, which reflect that Fricks had ranked Juror B.J. a four. When asked how he would have ranked Juror B.J. if he had known that she had been interviewed by the police after she had reported being the victim of a crime, Fricks stated that he "[d]efinitely" would have ranked her a five. (R. 263.) On cross-examination, Fricks testified that, absent his notes, he did not have an independent recollection of voir dire or why he had ranked prospective jurors a certain way. He also agreed with the State that there are many factors, some intangible, that play a part in jury selection. When asked by the assistant attorney general if "it would be hard for you to definitively provide the Court information that based upon a hypothesis if a certain juror had answered a certain question differently, that you either would or would not have struck them," Fricks responded: "I think I'm sure of how I would act given [the] example by petitioner's counsel. But in general I agree with you." (R. 315.)
Initially, we point out that the circuit court first found in its order that Brownfield had abandoned his juror-misconduct claim at the evidentiary hearing when he did not call Juror B.J. to testify. We disagree. It is well settled "that a petitioner is deemed to have abandoned a claim if he fails to present any evidence to support the claim at the evidentiary hearing." Brooks v. State, 929 So.2d 491, 497 (Ala. Crim. App. 2005) (emphasis added). See also Clark v. State, 196 So.3d 285, 313 (Ala. Crim. App. 2015), and the cases cited therein. However, Brownfield did not fail to present any evidence to support his juror-misconduct claim. To the contrary, he presented both testimonial and documentary evidence to support the claim. The fact that Brownfield chose not to elicit testimony from the juror in question does not constitute an abandonment of the claim. Indeed, testimony from the juror in question is not necessarily required to prove a claim of juror misconduct, particularly where the misconduct alleged is the failure to answer questions truthfully during voir dire. See, e.g., Porter v. State, 196 So.3d 365 (Ala. Crim. App. 2015) (reversing conviction on the ground that a juror failed to answer questions truthfully during voir dire even though the juror in *791 question did not testify at the hearing on the motion for a new trial). Therefore, the circuit court erred in finding that Brownfield had abandoned his claim of juror misconduct.
The circuit court also found in its order that Brownfield had failed to prove that Juror B.J. had committed misconduct answering voir dire questions. Although the circuit court did not expound on this conclusory finding in this portion of its order, it later found that the question asked was limited to suspects and witnesses and that, because Juror B.J. had been the victim of a crime, she was not a suspect or a witness and, thus, was not required to respond to the question. As explained more fully below, although the prosecutor mentioned suspects and witnesses when clarifying the initial question to the panel, we do not agree with the circuit court that the question was clearly limited to suspects and witnesses.
Finally, the circuit court found in its order that Brownfield had failed to establish that he might have been prejudiced by Juror B.J.'s failure to respond. Specifically, the court found that Juror B.J. had not willfully failed to answer the question and that whether a prospective juror had been the victim of a burglary was not material because another juror who had been the victim of a burglary sat on Brownfield's jury and because Brownfield had failed to prove that had Juror B.J. responded to the question, his trial counsel would have removed her from the panel. Brownfield argues on appeal that each of these findings is incorrect and unsupported by the record, and that he proved by a preponderance of the evidence that he might have been prejudiced by Juror B.J.'s failure to answer the prosecutor's question.
"The proper standard for determining whether juror misconduct warrants a new trial, as set out by this Court's precedent, is whether the misconduct might have prejudiced, not whether it actually did prejudice, the defendant. See Ex parte Stewart, 659 So.2d 122 (Ala. 1993) ; Campbell v. Williams, 638 So.2d 804 (Ala. 1994) ; Union Mortgage Co. v. Barlow, 595 So.2d 1335 (Ala. 1992), cert. denied, 506 U.S. 906, 113 S.Ct. 301, 121 L.Ed.2d 224 (1992). The 'might-have-been-prejudiced' standard, of course, casts a 'lighter' burden on the defendant than the actual-prejudice standard. See Tomlin v. State, supra, 695 So.2d [157,] at 170 [ (Ala. Crim. App. 1996) ]. ...
"It is true that the parties in a case are entitled to true and honest answers to their questions on voir dire, so that they may exercise their peremptory strikes wisely. See Fabianke v. Weaver, 527 So.2d 1253 (Ala. 1988). However, not every failure to respond properly to questions propounded during voir dire 'automatically entitles [the defendant] to a new trial or reversal of the cause on appeal.' Freeman v. Hall, 286 Ala. 161, 166, 238 So.2d 330, 335 (1970) ; see also Dawson v. State, supra, [710 So.2d 472,] at 474 [ (Ala. 1997) ] ; and Reed v. State, supra [547 So.2d 596 (Ala. 1989) ]. As stated previously, the proper standard to apply in determining whether a party is entitled to a new trial in this circumstance is 'whether the defendant might have been prejudiced by a veniremember's failure to make a proper response.' Ex parte Stewart, 659 So.2d at 124. Further, the determination of whether a party might have been prejudiced, i.e., whether there was probable prejudice, is a matter within the trial court's discretion. Eaton v. Horton, 565 So.2d 183 (Ala. 1990) ; Land & Assocs., Inc. v. Simmons, 562 So.2d 140 (Ala. 1989) (Houston, J., concurring specially).
*792 " 'The determination of whether the complaining party was prejudiced by a juror's failure to answer voir dire questions is a matter within the discretion of the trial court and will not be reversed unless the court has abused its discretion. Some of the factors that this Court has approved for using to determine whether there was probable prejudice include: "temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about." '
" Union Mortgage Co. v. Barlow, 595 So.2d at 1342-43 (quoting Freeman v. Hall, supra (other citations omitted))....
"The form of prejudice that would entitle a party to relief for a juror's nondisclosure or falsification in voir dire would be its effect, if any, to cause the party to forgo challenging the juror for cause or exercising a peremptory challenge to strike the juror. Ex parte Ledbetter, 404 So.2d 731 (Ala. 1981) ; Warrick v. State, 460 So.2d 320 (Ala. Crim. App. 1984) ; and Leach v. State, 31 Ala. App. 390, 18 So.2d 285 (1944). If the party establishes that the juror's disclosure of the truth would have caused the party either to (successfully) challenge the juror for cause or to exercise a peremptory challenge to strike the juror, then the party has made a prima facie showing of prejudice. Id. Such prejudice can be established by the obvious tendency of the true facts to bias the juror, as in Ledbetter, supra, or by direct testimony of trial counsel that the true facts would have prompted a challenge against the juror, as in State v. Freeman, 605 So.2d 1258 (Ala. Crim. App. 1992)."
Ex parte Dobyne, 805 So.2d 763, 771-73 (Ala. 2001).
After thoroughly considering the factors in Ex parte Dobyne, the record from Brownfield's direct appeal, and the evidence presented at the evidentiary hearing, we agree with the circuit court that Brownfield failed to meet his burden of establishing that he might have been prejudiced by Juror B.J.'s failure to disclose that she had been interviewed by the police because she had been the victim of a crime.
Temporal Remoteness. The matter inquired about was not temporally remote.[7] The record indicates that Brownfield's case was tried in February 2004. The evidence presented at the evidentiary hearing indicated that the burglary and/or theft of property from Juror B.J. occurred in September 2000, approximately three and a half years before Brownfield's trial. This is not a case in which the crime against the juror or juror's family member occurred decades before the trial, as in Marshall v. State, 182 So.3d 573 (Ala. Crim. App. 2014) (matter inquired about occurred 35 years before the defendant's trial), and McWhorter v. State, 142 So.3d 1195 (Ala. Crim. App. 2011) (matter inquired about occurred approximately 30 years before the defendant's trial). Moreover, the question propounded contained no time limitation. Therefore, this factor supports a finding of probable prejudice.
Ambiguity of the Question. This Court has recognized that "[i]n examining a juror-misconduct claim based on a juror's failure to answer questions truthfully, the phrasing of the exact question is critical." Bryant v. State, 181 So.3d 1087, 1125 (Ala. Crim. App. 2011). "Unless a juror is asked *793 a question which applies to him in a manner demanding response, it is permissible for a juror to remain silent; the juror is under no duty to disclose." Parish v. State, 480 So.2d 29, 30 (Ala. Crim. App. 1985).
As noted above, in its order the circuit court found that, when the prosecutor clarified the question, he expressly limited it solely to suspects or witnesses and that, because Juror B.J. was a victim, she was not a suspect or a witness and she committed no misconduct when she did not respond. Setting aside the fact that the victim of a crime may also reasonably be considered a witness, we cannot agree that the question was clearly limited to suspects and witnesses. However, we do conclude that the question was sufficiently ambiguous so as to excuse Juror B.J.'s failure to respond.
The initial question was clear and simple: "[H]as anyone ever been interviewed by a policeman?" However, when the prosecutor attempted to clarify the type of police contact he was and was not asking about, he turned that clear question into an ambiguous one. Although we do not agree with the circuit court that the prosecutor's clarification clearly limited the question solely to suspects and witnesses, we do believe that it could have reasonably been interpreted in that manner by prospective jurors. Indeed, the fact that one prospective juror interpreted the question as applying to crime victims and responded affirmatively to the question, while Juror B.J. did not respond supports the conclusion that the question was ambiguous. Therefore, this factor does not support a finding of probable prejudice.
Willfulness or Inadvertence. In its order, the circuit court found that Juror B.J. did not willfully fail to respond to the prosecutor's question. This finding was based on the court's earlier conclusion that, when the prosecutor clarified the question, he expressly limited it solely to suspects or witnesses and that Juror B.J. was a victim, not a suspect or a witness. As already explained, we do not agree with the circuit court's conclusion that the prosecutor's clarification of the question was clearly a limitation. However, because we do conclude that the question was ambiguous and because Brownfield did not call Juror B.J. to testify at the evidentiary hearing or present any circumstantial evidence of Juror B.J.'s reasons for not responding to the question, we conclude that this factor does not support a finding of probable prejudice.
Failure to Recollect. In its order, the circuit court stated the following regarding this factor: "[W]hether [Juror B.J.] would consider herself a victim or had any recollection of the crime at the time of voir dire was never explored due to Brownfield's failure to call Juror B.J. to the stand." (C. 1279.) We agree. No evidence was presented as to whether Juror B.J. had any recollection of the crime at the time of voir dire because Juror B.J. was not called to testify. Therefore, as with the previous factor, this factor does not support a finding of probable prejudice.
Materiality. "In the context of a juror's failure to disclose requested information, 'a material fact [is] " 'one which an attorney[,] acting as a reasonably competent attorney, would consider important in making the decision whether or not to excuse a prospective juror.' " ' " Jimmy DayPlumbing & Heating, Inc., v. Smith, 964 So.2d 1, 5 (Ala. 2007) (quoting Conference America, Inc. v. Telecommunications Coop. Network, Inc., 885 So.2d 772, 777 (Ala. 2003), quoting in turn, Gold Kist v. Brown, 495 So.2d 540, 545 (Ala. 1986) ). In its order, the circuit court found that the information not disclosed was not material to defense counsel when selecting the jury. This Court has recognized that "probable *794 injury could result from a juror's failure to disclose any experience as a crime victim because the juror could be less indifferent to someone charged with a crime than a juror who was not a crime victim." Tomlin v. State, 695 So.2d 157, 172 (Ala. Crim. App. 1996). See also Ex parte Ledbetter, 404 So.2d 731, 734 (Ala. 1981). Nonetheless, we agree with the circuit court's findings.
In its order, the circuit court first noted that another juror who had been the victim of a crime sat on Brownfield's jury, thus indicating that "being the victim of a burglary was not dispositive of whether or not the person served on the jury, decreasing the materiality of the matter." (C. 1279.) We agree. Although rarely is the answer to a single question during voir dire dispositive when selecting a jury, the fact that the information not disclosed by the juror in question had been disclosed by another juror who was not struck by defense counsel certainly undermines any claim that the nondisclosed information was material to counsel when selecting the jury. Additionally, we point out that trial counsel did not even ask the first two panels of prospective jurors if anyone had been the victim of crime; he asked that question only of the third and fourth panels. That counsel did not question half of the venire about whether anyone had been a crime victim strongly indicates that counsel did not believe that being a crime victim was a material consideration.
In its order, the circuit court also found that Brownfield had failed to prove that trial counsel would have struck Juror B.J. from the panel if she had responded to the prosecutor's question. Brownfield argues in brief, however, that his trial counsel "testified that he 'definitely' would have stricken [Juror B.J.] if she had answered truthfully." (Brownfield's brief, p. 83.) Brownfield's argument is not well taken; we agree with the circuit court.
As noted above, Fricks testified that he had ranked prospective jurors from one to five, with one being the most desirable juror, whom he "would want" to keep on the jury, and five being the least desirable juror, whom he "would want" to strike. Fricks testified that had Juror B.J. responded to the prosecutor's question and had he known that she had been the victim of a crime, he "definitely" would have ranked her a five. When asked whether, given the passage of time, it would be difficult for him to say definitively whether he would or would not have struck a certain juror if that juror had answered a question differently during voir dire, Fricks testified that he was "sure of how [he] would [have] act[ed] given [the] example by petitioner's counsel." (R. 315.)
Contrary to Brownfield's belief, Fricks was never asked if he would had stricken Juror B.J. had she disclosed that she had been the victim of a crime; he was asked only how he would have ranked her. Although Fricks indicated that he would have ranked her a five, a juror he "would want" to strike, Brownfield presented no evidence indicating that Fricks actually struck all prospective jurors whom he had ranked a five or that he would have struck Juror B.J. had he ranked her a five. Brownfield presented evidence indicating only that prospective jurors ranked a five were jurors Fricks would have wanted to strike. Moreover, the record does not support any inference that Fricks would have stricken Juror B.J. Fricks's notes from voir dire include notations and rankings for prospective jurors on panels one through three, and the record from Brownfield's direct appeal indicates that none of the prospective jurors on those panels whom Fricks had ranked a five sat on Brownfield's jury. However, Fricks's *795 notes contain no notations or rankings for any of the prospective jurors on panel four, yet five prospective jurors from that panel sat on Brownfield's jury. Because Fricks's notes contain no rankings for those jurors, it is possible that all five of the jurors from panel four who sat on Brownfield's jury had been ranked a five and were not struck; it is equally possible that those jurors had not been ranked a five. Simply put, Fricks's testimony that he would have ranked Juror B.J. a five if she had answered the prosecutor's question truthfully does not establish that he would have used a peremptory strike to remove her from the jury, and the record does not reflect that counsel, in fact, struck all prospective jurors who had been ranked a five so as to support an inference that Fricks's ranking Juror B.J. a five would have ultimately led to his striking her.
Under the circumstances in this case, we agree with the circuit court that Brownfield failed to satisfy his burden of proving that he might have been prejudiced by Juror B.J.'s failure to disclose that she had been interviewed by police as a crime victim. The information not disclosed was not temporally remote; however, the question propounded was ambiguous, there is no indication that Juror B.J. deliberately failed to answer the question, and the fact that Juror B.J. was a crime victim was only marginally material. Therefore, the circuit court properly denied Brownfield's claim of juror misconduct.
III.
Brownfield also contends that the circuit court erred in denying his claims that his trial counsel, Richard Fricks and Gary Hartline, were ineffective during the guilt phase of the trial in their choice of defense theories and during the penalty phase of the trial for not adequately investigating and presenting mitigating evidence.[8]
" 'In order to prevail on a claim of ineffective assistance of counsel, a defendant must meet the two-pronged test articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) :
" ' "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."
" ' 466 U.S. at 687, 104 S.Ct. at 2064.
" ' "The performance component outlined in Strickland is an objective one: that is, whether counsel's assistance, judged under 'prevailing professional norms,' was 'reasonable considering *796 all the circumstances.' " Daniels v. State, 650 So.2d 544, 552 (Ala. Cr. App. 1994), cert. denied, [ 514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995) ], quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2065. "A court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.
" 'The claimant alleging ineffective assistance of counsel has the burden of showing that counsel's assistance was ineffective. Ex parte Baldwin, 456 So.2d 129 (Ala. 1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985). "Once a petitioner has identified the specific acts or omissions that he alleges were not the result of reasonable professional judgment on counsel's part, the court must determine whether those acts or omissions fall 'outside the wide range of professionally competent assistance.' [ Strickland,] 466 U.S. at 690, 104 S.Ct. at 2066." Daniels, 650 So.2d at 552. When reviewing a claim of ineffective assistance of counsel, this court indulges a strong presumption that counsel's conduct was appropriate and reasonable. Hallford v. State, 629 So.2d 6 (Ala. Cr. App. 1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994) ; Luke v. State, 484 So.2d 531 (Ala. Cr. App. 1985). "This court must avoid using 'hindsight' to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel's actions before determining whether counsel rendered ineffective assistance." Hallford, 629 So.2d at 9. See also, e.g., Cartwright v. State, 645 So.2d 326 (Ala. Cr. App. 1994).
" ' "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."
" ' Strickland, 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted). See Ex parte Lawley, 512 So.2d 1370, 1372 (Ala. 1987).
" ' "Even if an attorney's performance is determined to be deficient, the petitioner is not entitled to relief unless he establishes that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable *797 probability is a probability sufficient to undermine confidence in the outcome.' [ Strickland,] 466 U.S. at 694, 104 S.Ct. at 2068."
" ' Daniels, 650 So.2d at 552.
" ' "When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer-including an appellate court, to the extent it independently reweighs the evidence-would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."
" ' Strickland, 466 U.S. at 697, 104 S.Ct. at 2069, quoted in Thompson v. State, 615 So.2d 129, 132 (Ala. Cr. App. 1992), cert. denied, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 418 (1993).
" '....'
" Bui v. State, 717 So.2d 6, 12-13 (Ala. Cr. App. 1997), cert. denied, 717 So.2d 6 (Ala. 1998)."
Dobyne v. State, 805 So.2d 733, 742-44 (Ala. Crim. App. 2000), aff'd, 805 So.2d 763 (Ala. 2001).
"In order to succeed on a claim of ineffective assistance of counsel, a petitioner must meet both prongs of the standard set out in Strickland." Davis v. State, 184 So.3d 415, 430 (Ala. Crim. App. 2014). "Because both prongs of the Strickland test must be satisfied to establish ineffective assistance of counsel, the failure to establish one of the prongs is a valid basis, in and of itself, to deny the claim" and a reviewing court need not " 'address both components of the inquiry if the [petitioner] makes an insufficient showing on one.' " Clark v. State, 196 So.3d 285, 303 (Ala. Crim. App. 2015) (quoting Strickland, 466 U.S. at 697 ).
With these principles in mind, we address Brownfield's claims.
A.
Brownfield first contends that his trial counsel were ineffective during the guilt phase of the trial for pursuing the defense that Brownfield had not committed the crimes and had falsely confessed, instead of conceding Brownfield's guilt and pursuing the defense of intoxication based on the theory that Brownfield was in a Xanax-induced rage at the time of the murders. Specifically, Brownfield argues that although counsel investigated the Xanax-induced-rage defense, they unreasonably abandoned that defense without fully and adequately investigating the false-confession defense and, as a result, counsel did not learn until after the trial had begun that the false-confession defense was not viable and that counsel would be unable to support that defense. Brownfield maintains that had counsel pursued the Xanax-induced-rage defense during the guilt phase of the trial, there is a reasonable probability that the jury would have, at the least, found him guilty of reckless manslaughter instead of capital murder under the theory of voluntary intoxication and may even have acquitted him under the theory of involuntary intoxication.
At the Rule 32 hearing, both Fricks and Hartline testified that they investigated the effects of Xanax and that they were aware that large doses of Xanax had been known to cause rage and violent outbursts. Fricks, who was primarily in charge of the guilt phase of the trial, testified that they hired an expert on the effects of Xanax and considered pursuing an intoxication defense based on the theory that Brownfield was in a Xanax-induced rage at the time of the murders. The record from Brownfield's direct appeal bears this out. In January 2003, after repeated requests, *798 the trial court authorized funds for counsel to retain Dr. Peter Breggin, both as an expert on the effects of Xanax and to evaluate Brownfield to determine his mental state at the time of the crimes and at the time of his confession. When a scheduling conflict prevented Dr. Breggin from assisting with the case, counsel requested and received funds in September 2003 to hire Dr. Lee Evans, a psychiatric pharmacologist, as an expert on the effects of both Xanax and methamphetamine and to hire Dr. Roger Lacy, a clinical psychiatrist, to evaluate Brownfield to determine his mental state at the time of the crimes and at the time of his confession.
According to Fricks, after evaluating Brownfield, Dr. Lacy expressed the belief that Brownfield had falsely confessed to the crimes, and it was at that point that the guilt-phase defense strategy veered away from intoxication and toward the theory that Brownfield had not committed the crimes and had falsely confessed,[9] and counsel attempted to obtain funds to retain Dr. Richard Ofshe as an expert in false confessions. The record from Brownfield's direct appeal reflects that counsel first requested funds for Dr. Ofshe in October 2003 but that the trial court denied the request. After two more attempts to obtain the funds, with counsel arguing to the trial court that both Dr. Lacy's and Dr. Evans's evaluations indicated the need for an expert on false confessions, the trial court finally granted Fricks's request on January 13, 2004, less than a month before trial was scheduled to begin. Although counsel repeatedly attempted to get the trial continued because of the short time Dr. Ofshe would have to consult on the case and because Dr. Ofshe had scheduling conflicts, the trial court denied counsel's requests. Jury selection began on February 9, 2004, and the guilt phase of the trial began on February 12, 2004.
Unable to resolve Dr. Ofshe's scheduling conflicts, on February 13, 2004, counsel filed a request for funds to hire Dr. Joe Dixon as an expert in false confessions to replace Dr. Ofshe; the trial court granted the motion on February 14, 2004. However, Dr. Dixon did not testify at Brownfield's trial. At the hearing on Brownfield's motion for a new trial,[10] Fricks testified that Dr. Dixon operated as a consultant throughout Brownfield's trial. At the Rule 32 hearing, Fricks testified that he did not call Dr. Dixon to testify because Dr. Dixon "would not have been helpful" and "would have not supported" the theory that Brownfield had not committed the crimes and had falsely confessed. (R. 273.) Fricks did not elaborate at the Rule 32 hearing on why Dr. Dixon would not have been helpful to the defense that Brownfield had not committed the crimes and had falsely confessed or what Dr. Dixon's opinion was, nor did Brownfield present any other evidence in this regard at the Rule 32 hearing. In other words, it is unclear whether Dr. Dixon was unable to support the defense theory because he had determined that Brownfield's confession was not false or because he had not had sufficient time to form an opinion.
In any event, at the Rule 32 hearing, Fricks testified that he believed that it was important to attack the State's case *799 against Brownfield during the guilt phase of the trial and not just to rely on intoxication as a defense. At the hearing on Brownfield's motion for a new trial, Fricks specifically testified that it was a strategic decision to focus during the guilt phase of the trial on the theory that Brownfield had not committed the crimes and had falsely confessed-in part because the State had made it clear from the beginning that it would not negotiate with Brownfield and that it was seeking the death penalty-and then to present evidence of intoxication and expert testimony on the rage-inducing effects of methamphetamine and Xanax during the penalty phase of the trial. Fricks explained:
"Well, the strategy was that this is not the man and that he didn't commit these murders, you know, to put it real bluntly and that his confession was either/or false based on false memory or false confession. And we certainly argued that it was a coerced confession, and Dr. Evans' expertise is that he is a pharmacologist, you know, a doctor in that field. And his testimony by default, I concluded, and again, Mr. Hartline dealt more with Mr. Evans, but Mr. Evans did come on at least one occasion to my office, you know, a week or two before the trial and we had a pretty extensive work session upwards to a day, and I concluded that it was too risky from one standpoint. You know, again, I'm adopting that there's not going to be any negotiation and that the State is trying to kill my client, and I have to defend him. And he is going to be defended with what I thought was the best approach that he didn't do it, and I thought that [Dr. Evans's] testimony would overlay that some and kind of get us going in two different directions. But it was a gamble, and it had to be made really from a sound foundation as I would want to have made that decision from."
(RDA, R. 2343-44.)
The record from Brownfield's direct appeal reflects that the State's case against Brownfield centered around his confession. Although the State presented other evidence linking Brownfield to the murders-such as evidence that Latham's DNA was found on a shoe belonging to Brownfield that was discovered at Tammy Farmer's apartment-the State's theory of the case was based on Brownfield's confession. The record further reflects that counsel vigorously attacked every aspect of the State's case, placing particular emphasis on discrediting Brownfield's confession by presenting evidence that undermined both the voluntariness and the truthfulness of that confession.
Counsel presented evidence indicating that Brownfield had been on a week-long methamphetamine binge before the murders, that Brownfield had taken several Xanax pills at one time before the murders, and that Brownfield's drug use resulted in a state of delirium, both at the time of the murders and at the time of the confession, that rendered Brownfield unable to recall his actions around the time of the crimes and unable to knowingly and voluntarily waive his Miranda [11] rights. According to Dr. Lacy, Brownfield was in a "drug soup" at the time of the murders and at the time of his confession as a result of his excessive use of methamphetamine and Xanax. (RDA, R. 1736.) Dr. Lacy explained that Xanax has amnestic properties, and that while suffering from a drug-induced delirium, a person is suggestible and will use bits and pieces of information gleaned from other people to fill in the gaps in his or her own memory. In Dr. *800 Lacy's opinion, that is what happened to Brownfield-he used information gleaned from other people to falsely confess to the murders while in a state of drug-induced delirium.
Counsel also presented evidence that directly contradicted Brownfield's confession and highlighted the inconsistencies between the confession and the State's other evidence. For example, in his confession, Brownfield said that he had killed Latham, Brenda, and Joshua between midnight and 4:00 a.m. on December 24, 2001. However, counsel presented testimony from one of Brenda's neighbors, who said that she saw Latham, Brenda, and Joshua alive the morning of December 24, 2001, as she was driving to work, and that she saw Brenda and Joshua again the afternoon of December 24, 2001, between 3:30 p.m. and 4:00 p.m., as she was driving home from work. The neighbor and her daughter also both testified that, between 7:00 p.m. and 8:00 p.m. the night of December 24, 2001, they heard screams coming from Brenda's house and saw a small automobile in front of Brenda's house. The neighbor said that the vehicle was silver or gold in color and that she saw the same vehicle again after the murders and that it was gold and had a Papa John's pizza sign on top. Evidence at trial indicated that one of Brownfield's friends drove a gold Nissan Maxima automobile and worked at Papa John's at the time of the murders.
Additionally, in his confession, Brownfield said that he took several Xanax pills around midnight on December 23, 2001, and that, after killing Brenda and Joshua, he left Brenda's house between 2:00 and 3:00 a.m. However, a State's witness testified that she saw Brownfield at a gasoline station on December 24, 2001, between 1:00 a.m. and 1:30 a.m., and two other State's witnesses and one defense witness testified that they saw Brownfield at a party sometime between midnight and 2:00 a.m. In other words, Brownfield was seen by multiple people during the time frame he said he was killing Brenda and Joshua. Brownfield also said in his confession that, after killing Latham, he left Latham's house at 4:00 a.m. on December 24, 2001, and drove to Stevenson, Alabama, where he disposed of his bloody clothes, the hammer, and the knife,[12] then drove to Kimball, Tennessee, where he drove around for a while, and then drove back to Scottsboro and went to a Wal-Mart discount store and made a purchase. The State presented evidence indicating that Brownfield made the purchase at Wal-Mart at 5:04 a.m. However, counsel presented evidence indicating that it takes at least 45 minutes to drive one way from Scottsboro to Kimball, Tennessee, thus making it impossible for Brownfield to have made the round trip in only one hour and four minutes.
At the Rule 32 hearing, Brownfield presented testimony from Dr. Jonathan Lipman, a neuropharmacologist and forensic pharmacologist. Brownfield maintains that Dr. Lipman's testimony "show[s] what a competent guilt-phase defense would have looked like." (Brownfield's brief, p. 23.) Dr. Lipman testified that Brownfield began using marijuana in his early 20s and then started taking hydrocodone pills and became addicted. Brownfield took as many as 10 to 12 hydrocodone pills daily and would also sometimes take Xanax. Approximately eight months before the murders, Brownfield began using methamphetamine and became a binge user of that drug, often binging for up to a week at a time, during which time he did not sleep or eat, and then using other drugs, such as hydrocodone, to end the binges and ease the effects of withdrawal from the methamphetamine.
*801 According to Dr. Lipman, Brownfield had been on a methamphetamine binge the week before the murders, during which time Brownfield did not eat or sleep and became paranoid, but Brownfield had been unable to obtain any hydrocodone to end the binge so he took between 7 and 10 Xanax pills just before the murders. Dr. Lipman opined that at the time of the murders Brownfield "was suffering from a paradoxical rage reaction caused by taking seven to ten Xanax pills" during which time Brownfield "was not able to control his conduct." (R. 930.) According to Dr. Lipman, the "[r]age provides a motivation to act, an impulse, or intent, or force toward doing something violent, hostile, combative," and because Xanax also causes disinhibition, that rage cannot be controlled. (R. 974.) Dr. Lipman also noted that people such as Brownfield, "with a history of depression[,] are more likely to experience hostility caused by Xanax." (R. 980.)
We note that Dr. Lipman's testimony was substantially similar to the testimony provided by Dr. Evans during the penalty phase of Brownfield's trial, see Part III.B. of this opinion wherein we summarize Dr. Evans's testimony, except that Dr. Evans said that not only can Xanax cause uncontrollable rage but also methamphetamine can as well and that it was his belief that Brownfield's rage at the time of the murders was the result of the potent combination of both methamphetamine and Xanax.
This is not a case in which counsel was unaware of alternative theories of defense or chose a defense theory without any information or investigation. Rather, this is a case in which counsel made a strategic choice among alternative defense theories, a choice Brownfield now, with the benefit of hindsight, assails. However, generally, "[s]trategic decisions at trial are left to the judgment of counsel and 'do not result in ineffective assistance of counsel, whether right or wrong.' " Brownlee v. State, 666 So.2d 91, 97 (Ala. Crim. App. 1995) (quoting Maxwell v. State, 620 So.2d 93, 97 (Ala. Crim. App. 1992) ). "[S]trategic decisions ... are virtually unassailable," McGahee v. State, 885 So.2d 191, 222 (Ala. Crim. App. 2003), and "it is not our function to second-guess the strategic decisions made by counsel." Smith v. State, 756 So.2d 892, 910 (Ala. Crim. App. 1997). Indeed, " '[c]ounsel cannot be deemed ineffective merely because current counsel disagrees with trial counsel's strategic decisions.' " Saunders v. State, 249 So.3d 1153, 1172 (Ala. Crim. App. 2016) (quoting Occhicone v. State, 768 So.2d 1037, 1048 (Fla. 2000) ). " '[A] tactical decision will not form the basis for an ineffective assistance of counsel claim unless it was "so patently unreasonable that no competent attorney would have chosen it." ' " State v. Gissendanner, [Ms. CR-09-0998, October 23, 2015] --- So.3d ----, ---- (Ala. Crim. App. 2015) (quoting Brown v. State, 288 Ga. 902, 909, 708 S.E.2d 294, 301 (2011) ).
" 'Trial counsel's decisions regarding what theory of the case to pursue represent the epitome of trial strategy.' Flowers v. State, 2010 Ark. 364, 370 S.W.3d 228, 232 (2010). 'What defense to carry to the jury, what witnesses to call, and what method of presentation to use is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.' State v. Miller, 194 W.Va. 3, 16, 459 S.E.2d 114, 127 (1995).
" ' " '[T]he mere existence of a potential alternative defense theory is not enough to establish ineffective assistance based on counsel's failure to present that theory.' " Hunt v. State, 940 So.2d 1041, 1067 (Ala. Crim. App. 2005), quoting *802 Rosario-Dominguez v. United States, 353 F.Supp.2d 500, 513 (S.D.N.Y. 2005). "Hindsight does not elevate unsuccessful trial tactics into ineffective assistance of counsel." People v. Eisemann, 248 A.D.2d 484, 484, 670 N.Y.S.2d 39, 40-41 (1998).'
" Davis v. State, 44 So.3d 1118, 1132 (Ala. Crim. App. 2009). ' "The fact that [a] defense strategy was ultimately unsuccessful with the jury does not render counsel's performance deficient." ' Bush v. State, 92 So.3d 121, 160-61 (Ala. Crim. App. 2009) (quoting Heath v. State, 3 So.3d 1017, 1029 (Fla. 2009) ). See also Johnson v. State, 769 So.2d 990, 1001 (Fla. 2000) (' "Simply because the ... defense did not work, it does not mean that the theory of the defense was flawed." ' (citations omitted))."
Clark v. State, 196 So.3d 285, 306 (Ala. Crim. App. 2015).
"The purpose of ineffectiveness review is not to grade counsel's performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [ (1984) ] ; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir. 1992) ('We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.'). We recognize that '[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.' Strickland, 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.' Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987)."
Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (footnote omitted). As this Court explained in Dunkins v. State, 489 So.2d 603 (Ala. Crim. App. 1985) :
" 'The Sixth Amendment does not require errorless counsel or counsel judged ineffective by hindsight.' Hoppins v. State, 440 So.2d 1125, 1127 (Ala. Crim. App. 1983). 'An adequate defense in the context of the constitutional right to counsel does not mean that counsel will not commit what may later prove to be tactical errors, and matters of trial strategy, in the absence of a clear showing of improper or inadequate representation, will be left to the judgment of trial counsel.' Bridges v. State, 391 So.2d 1086, 1091 (Ala. Crim. App. 1980)."
489 So.2d at 608.
"[T]he cases in which [Rule 32] petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between ... and [c]ases in which deliberate strategic decisions have been found to constitute ineffective assistance are even fewer and farther between." Brooks v. State, 929 So.2d 491, 499-500 (Ala. Crim. App. 2005) (citations omitted). " '[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct.' " Benjamin v. State, 156 So.3d 424, 443 (Ala. Crim. App. 2013) (quoting Occhicone v. State, 768 So.2d 1037, 1048 (Fla. 2000) ). " '[I]f an attorney is aware of a line of defense and makes a conscious decision to reject it, rather than failing to raise it simply because he was unaware that it existed, it is more likely that the failure to raise the defense was reasonable.' "
*803 Cade v. State, 629 So.2d 38, 41-42 (Ala. Crim. App. 1993) (quoting Gates v. Zant, 863 F.2d 1492, 1498 (11th Cir. 1989) ). "The choice of one reasonable trial strategy over another is not ineffective assistance." Zink v. State, 278 S.W.3d 170, 176 (Mo. 2009).
Viewing counsel's decision from counsel's perspective at the time, as we must, we cannot say that counsel's strategic decision to pursue the defense that Brownfield had not committed the crimes and had falsely confessed instead of pursuing the Xanax-induced-rage defense was outside the wide range of reasonable professional assistance or that no competent attorney would have chosen it. Counsel investigated Xanax-induced rage as a possible defense and retained expert assistance on the subject. However, after another expert, Dr. Lacy, evaluated Brownfield and opined that Brownfield had falsely confessed as a result of his drug use, which opinion was consistent with Dr. Evans's opinion that Brownfield's use of methamphetamine and Xanax in the days and hours leading up to the murders made it questionable that Brownfield would have been able to recall the murders, counsel's focus then shifted to the defense that Brownfield had not committed the crimes and had falsely confessed.
Although counsel did not present expert testimony on false confessions during the guilt phase of the trial, as already noted it is unclear whether that was because counsel's false-confession expert opined that Brownfield's confession was not false or because that expert had insufficient time to form an opinion, having been retained after the guilt phase of the trial had already begun.[13] In any event, " '[c]ounsel's failure to call an expert witness is not per se ineffective ....' " Marshall v. State, 20 So.3d 830, 841 (Ala. Crim. App. 2008) (quoting People v. Hamilton, 361 Ill.App.3d 836, 847, 838 N.E.2d 160, 170, 297 Ill.Dec. 673, 683 (2005) ). That counsel did not present expert testimony on false confessions does not render counsel's decision to pursue that theory unreasonable under the circumstances in this case.[14] Counsel had other evidence supporting the theory that Brownfield had not committed the murders and had falsely confessed. Not only did counsel present Dr. Lacy's testimony regarding Brownfield's drug use and its effects, counsel also presented evidence that supported Dr. Lacy's opinion and that undermined the truthfulness of Brownfield's confession, i.e., that all three victims were seen alive hours after Brownfield said he had killed them, that Brownfield was seen by multiple people during the exact time he told police that he was murdering Brenda and Joshua, and that Brownfield's timeline of events was inconsistent with other evidence.
Contrary to Brownfield's belief, the defense presented by counsel was not unsupported, and it was supported by evidence independent of Brownfield's statements. The Xanax-induced-rage defense, however, *804 would have depended entirely on Brownfield's statements, to police and experts, that he had taken several Xanax pills just before the murders. Although there was evidence presented at trial that Brownfield was a drug user and that he had used methamphetamine in the week preceding the murders, the only evidence presented at trial or at the Rule 32 hearing that Brownfield had taken Xanax just before the murders was Brownfield's self-serving statements.[15] Although Dr. Lacy's opinion was also based largely on Brownfield's self-reported drug use, it was supported by other evidence and witness testimony that undermined the truthfulness of Brownfield's confession. In other words, counsel did not rely solely on Brownfield's own self-serving statements to support the defense theory. The Xanax-induced-rage defense, however, would have been based entirely on Brownfield's own self-serving statements that he had taken several Xanax pills just before the murders, statements unsubstantiated by any independent evidence. See, e.g., Ex parte McWhorter, 781 So.2d 330, 342 (Ala. 2000) ; Smith v. State, 246 So.3d 1086 (Ala. Crim. App. 2017) ; Phillips v. State, [Ms. CR-12-0197, December 18, 2015] --- So.3d ----, ---- (Ala. Crim. App. 2015) ; Harbin v. State, 14 So.3d 898, 909-11 (Ala. Crim. App. 2008) ; and Clark v. State, 896 So.2d 584, 641-42 (Ala. Crim. App. 2000) (opinion on return to remand) (all recognizing that an accused's self-serving statement may not be sufficient, by itself, to warrant a jury instruction).
Counsel here was faced with a choice of two alternative defense theories. Both theories were reasonable, given the information known to counsel at the time. Counsel chose to pursue one theory over the other, in part because of the nature of the charges and the State's unwillingness to negotiate. Fricks recognized that pursuing the theory that Brownfield had not committed the murders and had falsely confessed was a gamble but he believed that it was important to attack to the State's case instead of conceding Brownfield's guilt and relying solely on intoxication. Moreover, unlike the Xanax-induced-rage defense rejected by counsel, counsel's chosen defense theory was supported by evidence and witness testimony independent of Brownfield's self-serving statements that he had taken Xanax the night of the murders. Under these circumstances, we cannot say that counsel's choice was unreasonable. Therefore, the circuit court properly denied this claim of ineffective assistance of trial counsel.
B.
Brownfield also contends that his trial counsel were ineffective during the penalty *805 phase of the trial for not adequately investigating and presenting mitigating evidence. Specifically, Brownfield argues that, although counsel hired a mitigation expert, they failed to properly supervise that expert and, as a result, three weeks before trial, the expert resigned after having done nothing other than interview Brownfield, and counsel was then forced to hire another expert who was unable to complete an adequate mitigation investigation before she testified during the penalty phase of the trial. Brownfield argues that had counsel properly supervised their mitigation expert and ensured that a comprehensive mitigation investigation was completed, counsel would have discovered and presented a wealth of additional mitigating evidence the jury and the trial court never had the opportunity to hear.
Assuming, without deciding, that counsel's performance with respect to the mitigation investigation was deficient, we conclude that Brownfield was not prejudiced. As already noted, "[w]hen a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer-including an appellate court, to the extent it independently reweighs the evidence-would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland v. Washington, 466 U.S. 668, 695, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "To assess that probability, we consider 'the totality of the available mitigation evidence-both that adduced at trial, and the evidence adduced in the habeas proceeding'-and 'reweig[h] it against the evidence in aggravation.' " Porter v. McCollum, 558 U.S. 30, 41, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009) (quoting Williams v. Taylor, 529 U.S. 362, 397-98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ). Moreover, we " 'must consider the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied.' " McWhorter v. State, 142 So.3d 1195, 1231 (Ala. Crim. App. 2011).
During the penalty phase of the trial, counsel presented testimony from Dr. Lee Evans, a psychiatric pharmacist, about the effects of both methamphetamine and Xanax. Dr. Evans testified that both methamphetamine and Xanax can cause violent outbursts, especially the longer a person uses the drugs and the higher the dosage of the drugs. He also testified that Brownfield had a history of binging on methamphetamine and then using other drugs like hydrocodone and Xanax to end the binges. Based on his evaluation of Brownfield, Dr. Evans opined that the combination of Brownfield's excessive methamphetamine use in the week before the murders and his taking of Xanax just before the murders caused a "drug-induced psychosis" that led to "homicidal rage," during which Brownfield was unable to control his actions because of the disinhibition effect of Xanax, and that Brownfield suffered from a "disassociative reaction" during the murders, as if he was watching someone else commit the crimes. (RDA, R. 2198-2202.) According to Dr. Evans, the combination of drugs also caused a "prolonged state of confusion and amnesia" after the murders making it questionable whether Brownfield remembered the murders in the days following or simply used "bits and pieces" of information from other people to "put together some sort of story that allow[ed him] to understand what happened." (RDA, R. 2202-03.) Dr. Evans testified that, at the time of the murders, Brownfield was under the influence of extreme mental or emotional disturbance and his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.
*806 Counsel also presented testimony from Dr. Karen Salekin, a clinical and forensic psychologist, about Brownfield's life. Dr. Salekin testified that she conducted a "bio psychosocial interview" of Brownfield, spoke with collateral sources about Brownfield, and examined records defense counsel had provided to her. (RDA, R. 2214.) Dr. Salekin testified that Brownfield had a difficult childhood, one plagued by isolation and loneliness because he was obese and was teased and ostracized by his peers. According to Dr. Salekin, Brownfield had no friends until he reached the age of 16, at which time he became friends with people who were involved in drugs. Dr. Salekin also testified that Brownfield's parents were older when they had him and, as a result, as he was growing up, his parents' physical health declined. Although his parents were loving and Brownfield had a good relationship with them, by the time he was 12 years old, Brownfield was their caregiver, not only because of their declining physical health, but because of his mother's drug addiction. Dr. Salekin testified that Brownfield's mother had over 20 different surgical procedures during Brownfield's life, that she became addicted to drugs, including Xanax, and that she had a "severe substance dependent disorder" for which she had been hospitalized multiple times. (RDA, R. 2215.) At least one of those hospitalizations was initiated by Brownfield himself. According to Dr. Salekin, Brownfield's mother was intoxicated the majority of the time he was growing up, was often too ill to take care of herself, much less Brownfield, and was so intoxicated sometimes that Brownfield could not even wake her. As a result, Dr. Salekin said, from the age of 12 Brownfield suffered from "parent identification," meaning that he effectively became the parent for his parents, having to cook, clean, take care of the house, and take care of his parents. (RDA, R. 2218.)
Dr. Salekin testified that Brownfield began using drugs at the age of the 16 when he first made friends with some people who were using drugs and that his drug use increased substantially when he was about 21 years old, after his father died; Brownfield used painkillers, Xanax, and marijuana on a regular basis. According to Dr. Salekin, Brownfield's mother died when he was about 24 years old and because Brownfield had spent most of his life at home caring for one or both his parents, Brownfield "lost his roots"-he had no where to go and lost any sense of purpose in his life. (RDA, R. 2221.) Brownfield spent the next few years living in different places with friends and family and using drugs more and more heavily to the point of becoming an addict. During this time, Dr. Salekin said, Brownfield "always had pills on hand because he didn't want to experience the withdrawal symptoms because he was in the dependency phase of the [substance-abuse] disorder which means that he had a high tolerance for the drugs." (RDA, R. 2222.) In the several months preceding the murders, Dr. Salekin said, Brownfield began using methamphetamine. According to Dr. Salekin, methamphetamine is very addictive and has extreme negative side effects, including violence and psychosis. Brownfield became a binge user of methamphetamine, using other drugs to end the binges and to ease the effects of withdrawal.
Dr. Salekin testified that Brownfield suffered from substance-dependency disorder and dysthymic disorder, a form of depression characterized by "long term lower level depression" often originating in childhood, but that Brownfield never received treatment for those illnesses. (RDA, R. 2223-24.) Dr. Salekin said that, throughout his life, Brownfield suffered from chronic sadness, low self-esteem, and suicidal ideations ; that Brownfield had attempted suicide *807 multiple times, including when he was a teenager after his first girlfriend left him; and that at one point police had to remove Brownfield from a motel room where he had gone to hide because he was afraid he would hurt himself. Dr. Salekin also stated that for approximately two years, Brownfield had a girlfriend who cheated on him regularly-"she would discard him and she would come back and he would take her back, and then she would discard him again" (RDA, R. 2225)-and that each time he was hurt by this girlfriend, Brownfield would become more depressed and his drug use would increase. According to Dr. Salekin, Brownfield never felt comfortable talking to other people about his problems and he "kept it all in." (RDA, R. 2226.)
Dr. Salekin testified that everyone she spoke to who knew Brownfield described him as a gentle person and indicated that violence was out of character for him. The crimes Brownfield committed, Dr. Salekin said, were solely the result of his drug use. Dr. Salekin also testified that Brownfield had done "wonderful" in jail in the two years since his arrest, likely because he no longer had access to the drugs he had been using. (RDA, R. 2227.) Dr. Salekin opined that Brownfield was a low risk for violence in prison if he were to be sentenced to life imprisonment without the possibility of parole. Dr. Salekin also testified that her mitigation investigation was not as comprehensive as she "would have liked" because she had only about three weeks to complete the investigation and, according to her, it takes about three months to do a comprehensive investigation. (RDA, R. 2227.) Nonetheless, she said that she believed that the information she gathered was accurate.
Finally, counsel presented testimony during the penalty phase of the trial from Elizabeth Scott, Brownfield's half-sister; Priscilla O'Steen, Brownfield's niece; and Erik Skelton, one of Brownfield's friends. Both Scott and O'Steen testified that they were not close with Brownfield when he was growing up but that when Brownfield's father became seriously ill in 1993, when Brownfield was about 19 years old, they began a close relationship with Brownfield, spending time with Brownfield and his parents almost every weekend until his father died in 1995. Both described Brownfield as quiet and easygoing and said that violence was out of character for him. Scott further testified that Brownfield took care of his parents and, at one point, even quit his job to care for his father. Skelton also testified that violence was out of character for Brownfield.
We also point out that during the guilt phase of the trial, counsel presented an abundance of testimony from several of Brownfield's friends and coworkers regarding his relationship with Joshua and how he was a father figure for Joshua and took care of Joshua.
At the Rule 32 hearing, Brownfield presented testimony from Dr. Jonathan Lipman which, as noted in Part III.A. of this opinion, was substantially similar to the testimony of Dr. Evans during the penalty phase of Brownfield's trial. Brownfield also presented additional testimony from Scott and O'Steen at the Rule 32 hearing.[16] Their testimony at the Rule 32 hearing was substantially similar to their testimony at Brownfield's trial, although somewhat more detailed. For example, at trial both Scott and O'Steen testified that they saw Brownfield and his parents almost every weekend after Brownfield's father got sick and Scott testified that Brownfield took *808 care of his parents; at the Rule 32 hearing, they both testified that they witnessed Brownfield take care of his parents during their weekend visits, such as preparing his parents' meals and giving his parents their medications. Additionally, Scott and O'Steen testified at the Rule 32 hearing that Brownfield's house was messy and had roaches and that he was upset and crying at his father's funeral. They both also testified that, after the murders, Brownfield expressed remorse.
Jerome and Wanda Dean testified at the Rule 32 hearing that they were in a gospel group with Brownfield's parents from the time Brownfield was about 6 years old until he was about 12 or 13 years old. Both said that Brownfield had a good relationship with his parents during that time; that he attended church regularly with his parents during that time; and that they had never known Brownfield to be violent.
Jason Cosby testified that he was a friend of Brownfield's from kindergarten through high school. He said that Brownfield was overweight as a child and was ridiculed, but that Brownfield "kept a very good temperament" about it and never got angry. (R. 438.) He also said that Brownfield's family was very religious; that Brownfield dressed differently than other children; and that Brownfield was nice and would help anyone. Cosby said that violence was out of character for Brownfield and that, after the murders, Brownfield expressed remorse.
Alan Thompson testified that he had been friends with Brownfield since the fifth grade. Thompson said that Brownfield was not the most popular kid in school because he was shy but that everyone knew him. According to Thompson, Brownfield was overweight and got picked on occasionally but not "a whole lot." (R. 461.) Thompson also said that Brownfield was very passive and never confrontational, and that he had never seen Brownfield act aggressively. Thompson stated that Brownfield had a good relationship with his parents and that he took care of them when their health failed. Thompson said that there were times that Brownfield would distance himself from others for a period and that he would then return to his normal self. According to Thompson, when his father died, Brownfield was upset, and he distanced himself from his friends. After Brownfield's mother died, Thompson said, Brownfield moved in with him and his wife for approximately six or eight months. Brownfield left after getting into an argument with Thompson's wife, and Thompson saw Brownfield only once after that before his arrest. Thompson also testified that he visited Brownfield in jail after the murders and that Brownfield expressed remorse.
Dr. Salekin testified at the Rule 32 hearing that she had been hired to conduct a mitigation investigation for Brownfield only three weeks before she testified at the penalty phase of Brownfield's trial. She testified that three weeks was not sufficient time in which to conduct an adequate mitigation investigation; that there were several people from Brownfield's life whom she had wanted to interview but could not because of the time constraints; and that there were records she wanted to review, such as medical and mental-health records for Brownfield's entire family, that she could not review because of the time constraints. According to Dr. Salekin, had she been able to conduct a full and complete mitigation investigation, she could have provided "a much more comprehensive presentation of Mr. Brownfield's life." (R. 861.) Dr. Salekin's invoice indicated that she spent a total of 25 hours conducting a mitigation investigation; she testified at the hearing that 14 of those 25 hours were *809 spent traveling from Tuscaloosa to Scottsboro.
Dr. Marianne Rosenzsweig, a clinical and forensic psychologist, conducted a mitigation investigation for purposes of the Rule 32 proceedings. Dr. Rosenzsweig interviewed Brownfield, conducted various psychological tests on Brownfield, spoke with collateral sources about Brownfield, reviewed various records relating to Brownfield, and reviewed Brownfield's mother's medical records.[17] The bulk of Dr. Rosenzsweig's testimony was substantially similar, albeit more detailed, to that of Dr. Salekin during the penalty phase of Brownfield's trial.
Dr. Rosenzsweig, like Dr. Salekin, testified about Brownfield's difficult childhood; his obesity ; his drug addiction; his low self-esteem; and his good relationship with his parents. Dr. Rosenzsweig, like Dr. Salekin, also testified that Brownfield was passive; that he took care of his parents as their health declined; that his mother had almost 30 surgical procedures during his life; that his mother was a drug addict, was intoxicated most of the time, and had been hospitalized for treatment for addiction multiple times; that he had attempted suicide multiple times; that after his mother died, his drug use increased and he moved around a lot, living with friends and family; and that he distanced himself from friends after his parents died, and one time police had to remove him from a hotel room. Like Dr. Salekin, Dr. Rosenzsweig also testified that Brownfield dated a woman who cheated on him regularly.
In addition, Dr. Rosenzsweig testified that Brownfield attended church as a child, that his parents were hoarders, and that there were roaches and rats in their house. According to Dr. Rosenzsweig, Brownfield was sexually abused as a child by a babysitter and by an older boy at his church. Dr. Rosenzsweig also said that Brownfield's mother suffered significant burns at one point and had to have skin grafts; had suicidal thoughts; complained of physical ailments in order to feed her drug addiction; and was a "poly-surgical addict," i.e., someone who seeks medical treatment and surgical procedures for conditions that do not exist in order to get attention. (R. 637.) Dr. Rosenzsweig testified that Brownfield's mother was in significant pain in the months before her death; that she was put on a ventilator shortly before she died but she pulled the tube out of her throat and Brownfield and Brenda made the decision not to put her back on the ventilator; and that Brownfield was present when his mother died. According to Dr. Rosenzsweig, after Brownfield's father died, Brownfield and his mother had little money and he would have to ask family members and neighbors for food. Dr. Rosenzsweig further testified that a few years after his mother died, one of Brownfield's close friends also died, and Brownfield increased his drug use to numb the grief. Dr. Rosenzsweig testified that the girlfriend who cheated on Brownfield also got pregnant and had an abortion without first telling Brownfield. Dr. Rosenzsweig also testified that Brownfield was close to Brenda and Latham until several months before the murders; in those months, Brownfield's drug use increased (he began using methamphetamine), which Latham disapproved of, and Brownfield and Brenda, who also abused drugs, began to argue about drugs and money, and Brenda became verbally abusive toward Brownfield. Dr. Rosenzsweig further said that Brownfield was close to Joshua.
Dr. Rosenzsweig concluded that Brownfield suffered from dependent-personality *810 disorder, characterized by a pervasive "need to be taken care of" and a "clinging behavior and fears of separation" (R. 586), as well as overcontrolled hostility, characterized by passivity and "strong inhibitions against expressing ... anger or irritation" which result in anger accumulating over time and then exploding in response to a triggering event. (R. 592.)
Much of the mitigating evidence presented during the Rule 32 proceeding was cumulative to the mitigating evidence presented during the penalty phase of Brownfield's trial.
" ' "[T]he failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation." Nields v. Bradshaw, 482 F.3d 442, 454 (6th Cir. 2007) (quoting Broom v. Mitchell, 441 F.3d 392, 410 (6th Cir. 2006) ).' Eley v. Bagley, 604 F.3d 958, 968 (6th Cir. 2010). 'This Court has previously refused to allow the omission of cumulative testimony to amount to ineffective assistance of counsel.' United States v. Harris, 408 F.3d 186, 191 (5th Cir. 2005). 'Although as an afterthought this [witness] provided a more detailed account with regard to [mitigating evidence], this Court has held that even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present cumulative evidence.' Darling v. State, 966 So.2d 366, 377 (Fla. 2007)."
Daniel v. State, 86 So.3d 405, 429-30 (Ala. Crim. App. 2011).
" '[I]n order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way-in strength and subject matter-from the evidence actually presented at sentencing.' Hill v. Mitchell, 400 F.3d 308, 319 (6th Cir.), cert. denied, 546 U.S. 1039, 126 S.Ct. 744, 163 L.Ed.2d 582 (2005). In other cases, we have found prejudice because the new mitigating evidence is 'different from and much stronger than the evidence presented on direct appeal,' 'much more extensive, powerful, and corroborated,' and 'sufficiently different and weighty.' Goodwin v. Johnson, 632 F.3d 301, 328, 331 (6th Cir. 2011). We have also based our assessment on 'the volume and compelling nature of th[e new] evidence.' Morales v. Mitchell, 507 F.3d 916, 935 (6th Cir. 2007). If the testimony 'would have added nothing of value,' then its absence was not prejudicial. [Bobby v.] Van Hook, [558 U.S. 4, 12,] 130 S.Ct. at 19 [ (2009) ]. In short, 'cumulative mitigation evidence' will not suffice. Landrum v. Mitchell, 625 F.3d 905, 930 (6th Cir. 2010), petition for cert. filed (Apr. 4, 2011) (10-9911)."
Foust v. Houk, 655 F.3d 524, 539 (6th Cir. 2011). " '[A] claim of ineffective assistance of counsel for failing to investigate and present mitigation evidence will not be sustained where the jury was aware of most aspects of the mitigation evidence that the defendant argues should have been presented.' " Walker v. State, 194 So.3d 253, 288 (Ala. Crim. App. 2015) (quoting Frances v. State, 143 So.3d 340, 356 (Fla. 2014) ). Here, the jury and the trial court were aware of most aspects of the mitigating evidence Brownfield argues should have been presented.
Moreover, the additional evidence Brownfield presented at the Rule 32 hearing that was not presented at his trial was not so strong and cogent as to create a reasonable probability that the outcome of the trial would have been different had the evidence been presented. The record from Brownfield's direct appeal reflects that the State proved, and the trial court found, the existence of three aggravating circumstances: that the murder of Latham was *811 committed during the course of a burglary, see § 13A-5-49(4), Ala. Code 1975; that all three murders were committed by one act or pursuant to one scheme or course of conduct, see § 13A-5-49(9), Ala. Code 1975; and that all three murders were especially heinous, atrocious, or cruel as compared to other capital offenses, see § 13A-5-49(8), Ala. Code 1975. The trial court found the existence of one statutory mitigating circumstance-that Brownfield had no significant history of prior criminal activity, see § 13A-5-51(1), Ala. Code 1975-and several nonstatutory mitigating circumstances. See Brownfield v. State, 44 So.3d 1, 39-42 (Ala. Crim. App. 2007).
We have carefully examined the record from Brownfield's direct appeal and the record of the Rule 32 proceedings and, after considering the mitigating evidence presented during the Rule 32 proceedings, the mitigating evidence presented at Brownfield's trial, and the evidence presented by the State in aggravation, we are confident that the omitted mitigating evidence would have had no impact on the jury's decision to recommend that Brownfield be sentenced to death or on the trial court's decision to sentence Brownfield to death. Moreover, we have reweighed the evidence in aggravation against all the evidence in mitigation from both the Rule 32 proceedings and Brownfield's trial, and we conclude that the omitted mitigating evidence would not have altered the balance of the aggravating circumstances and the mitigating circumstances in this case.
Therefore, Brownfield was not prejudiced by counsel's failure to present additional mitigating evidence during the penalty phase of the trial, and the trial court properly denied this claim of ineffective assistance of counsel.
IV.
Finally, Brownfield contends that his appellate counsel were ineffective for not arguing as an issue on appeal whether the trial court erred in denying Brownfield's request for a jury instruction on involuntary intoxication. At the Rule 32 hearing, Brownfield introduced into evidence the briefs filed by appellate counsel on direct appeal, but he did not call his appellate counsel to testify.
"It is extremely difficult, if not impossible, to prove a claim of ineffective assistance of counsel without questioning counsel about the specific claim, especially when the claim is based on specific actions, or inactions, of counsel that occurred outside the record. Indeed, 'trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective.' Rylander v. State, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003). This is so because it is presumed that counsel acted reasonably:
" 'The presumption impacts on the burden of proof and continues throughout the case, not dropping out just because some conflicting evidence is introduced. "Counsel's competence ... is presumed, and the [petitioner] must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." Kimmelman v. Morrison, 477 U.S. 365, 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305 (1986) (emphasis added) (citations omitted). An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption. Therefore, "where the record is incomplete or unclear about [counsel]'s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment." Williams [v. Head,] 185 F.3d [1223,] 1228 [ (11th Cir. 1999) ] ; see also *812 Waters [v. Thomas,] 46 F.3d [1506,] 1516 [ (11th Cir. 1995) ] (en banc) (noting that even though testimony at habeas evidentiary hearing was ambiguous, acts at trial indicate that counsel exercised sound professional judgment).'
" Chandler v. United States, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000). ' "If the record is silent as to the reasoning behind counsel's actions, the presumption of effectiveness is sufficient to deny relief on [an] ineffective assistance of counsel claim." ' Dunaway v. State, [198] So.3d [530], [547] (Ala. Crim. App. 2009) [, rev'd on other grounds, 198 So.3d 567 (Ala. 2014) ] (quoting Howard v. State, 239 S.W.3d 359, 367 (Tex. App. 2007) )."
Broadnax v. State, 130 So.3d 1232, 1255-56 (Ala. Crim. App. 2013). See also Stallworth v. State, 171 So.3d 53, 92-93 (Ala. Crim. App. 2013) (opinion on return to remand). In Clark v. State, 196 So.3d 285 (Ala. Crim. App. 2015), this Court held that a Rule 32 petitioner had failed to prove that appellate counsel had been ineffective for not raising certain issues on appeal where, as here, the petitioner introduced into evidence appellate counsel's briefs on appeal but did not call appellate counsel to testify; we explained:
"Because Clark failed to call his appellate counsel to testify at the evidentiary hearing regarding these claims, the record is silent as to whether appellate counsel's decision not to make the arguments listed above was strategic. Although the briefs appellate counsel filed on appeal certainly establish what arguments counsel did and did not make, they shed no light on the reasoning behind counsel's actions and are not sufficient, by themselves, to prove that appellate counsel was ineffective."
196 So.3d at 312.
Similarly, here, absent any testimony from appellate counsel, the record is silent regarding the reasons counsel did not raise as an issue on appeal whether the trial court erred in denying Brownfield's requested jury instruction on involuntary intoxication, and we must presume that counsel acted reasonably.
Brownfield failed to prove that his appellate counsel were ineffective. Therefore, the circuit court properly denied this claim.
V.
Based on the foregoing, the judgment of the circuit court denying Brownfield's Rule 32 petition is affirmed.
AFFIRMED.
Welch, Burke, and Joiner, JJ., concur. Windom, P.J., concurs in the result.
On Application for Rehearing
On December 15, 2017, this Court affirmed the circuit court's denial of James Ben Brownfield's Rule 32, Ala. R. Crim. P., petition for postconviction relief, in which he attacked his 2004 convictions for three counts of capital murder and his resulting sentence of death. On February 27, 2018, Brownfield filed an application for rehearing requesting that we set aside our judgment. Brownfield raises several arguments on rehearing, one of which merits discussion.
Brownfield argues that this Court erred in not addressing his claim that his trial counsel lacked the qualifications necessary to represent him on the capital charges. Brownfield argues that one of his trial counsel, Richard Fricks, had been practicing law for less than 5 years at the time of his appointment and, therefore, that he failed to meet the statutory qualifications for representing a capital defendant as set out in § 13A-5-54, Ala. Code 1975, and that although Gary Hartline, his other trial counsel, had been practicing criminal law for 16 years at the time of his appointment, *813 Hartline's involvement in the case was limited to the penalty phase of the trial and should not be considered in determining whether the requirements in § 13A-5-54 were met. Brownfield also argues that neither Fricks nor Hartline had the requisite experience to represent a capital defendant as mandated by the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003 ed.). According to Brownfield, counsel's lack of qualifications to represent him is "directly relevant to the question of what deference the Court should give to purportedly 'strategic' decisions by inexperienced counsel," "unquestionably supports" a finding that he was denied the effective assistance of counsel, and warrants this Court granting his application for rehearing and reversing the circuit court's denial of his Rule 32 petition. (Brownfield's rehearing brief, p. 74.)
In his initial brief on appeal, Brownfield listed and argued as an issue that his trial counsel were not qualified to represent him. He made the same arguments about counsel's qualifications he now makes on rehearing. However, in arguing counsel's alleged lack of qualifications in his initial brief, and in his reply brief, Brownfield stated that he "does not seek relief solely because his attorneys were not qualified. But this Court should accord less deference to defense counsel's choices in light of their lack of qualifications." (Brownfield's brief, p. 54.) Although the State treated Brownfield's argument as a separate claim for relief and addressed it, because Brownfield made it clear that his argument about counsel's qualifications was not an independent claim for relief, we did not address it as one in our opinion. However, the fact that this Court did not address Brownfield's argument as a separate claim for relief does not mean that we did not consider counsel's qualifications in evaluating Brownfield's claims of ineffective assistance of counsel.
To the extent that Brownfield now argues on rehearing that counsel's alleged lack of qualifications is a separate claim for relief, that claim is not properly before this Court for review because Brownfield did not raise counsel's qualifications as an independent claim for relief in his initial brief on appeal. See, e.g., Water Works & Sewer Bd. of City of Selma v. Randolph, 833 So.2d 604, 608 (Ala. 2002) ("The well-settled rule of this Court precludes consideration of arguments made for the first time on rehearing."). To the extent that Brownfield argues on rehearing that this Court failed to consider counsel's qualifications when evaluating his claims of ineffective assistance of counsel, that argument is meritless because we did consider counsel's qualifications when evaluating Brownfield's claims.
The other arguments advanced by Brownfield on rehearing have already been addressed by this Court in our original opinion and warrant no further discussion. Accordingly, Brownfield's application for rehearing is overruled.
APPLICATION OVERRULED.
Windom, P.J., and Welch, Burke, and Joiner, JJ., concur.

Sections 13A-5-45, 13A-5-46, and 13A-5-47, Ala. Code 1975, were amended by Act No. 2017-131, Ala. Acts 2017, to place the final sentencing decision in the hands of the jury; the jury's penalty-phase verdict is no longer a recommendation.

This Court may take judicial notice of its own records, and we do so in this case. See Nettles v. State, 731 So.2d 626, 629 (Ala. Crim. App. 1998), and Hull v. State, 607 So.2d 369, 371 n.1 (Ala. Crim. App. 1992).

The time for filing a Rule 32 petition in a case in which the death penalty has been imposed was changed by Act No. 2017-417, Ala. Acts 2017. However, that act does not apply retroactively to Brownfield. See § 3, Act No. 2017-417, Ala. Acts 2017.

The amended petition superseded the original petition. See, e.g., Reeves v. State, 226 So.3d 711, 722 (Ala. Crim. App. 2016) ; and Smith v. State, 160 So.3d 40, 47-49 (Ala. Crim. App. 2010). All further references in this opinion to Brownfield's petition shall be considered references to the amended petition.

Brownfield does not pursue on appeal those claims from his petition the circuit court summarily dismissed; therefore, those claims are deemed abandoned and will not be considered by this Court. See, e.g., Ferguson v. State, 13 So.3d 418, 436 (Ala. Crim. App. 2008). ("[C]laims presented in a Rule 32 petition but not argued in brief are deemed abandoned."); and Brownlee v. State, 666 So.2d 91, 93 (Ala. Crim. App. 1995) ("We will not review issues not listed and argued in brief.").

In fact, in this case, the judge who presided over the Rule 32 proceedings was the same judge who had presided over Brownfield's trial.

The circuit court did not address this factor in its order.

Although Brownfield raised several additional claims of ineffective assistance of trial counsel in his petition, he pursues in his brief on appeal only these two claims. Those claims of ineffective assistance of trial counsel raised in Brownfield's petition but not pursued on appeal are deemed abandoned and will not be considered by this Court. See, e.g., Ferguson v. State, 13 So.3d 418, 436 (Ala. Crim. App. 2008). ("[C]laims presented in a Rule 32 petition but not argued in brief are deemed abandoned."); and Brownlee v. State, 666 So.2d 91, 93 (Ala. Crim. App. 1995) ("We will not review issues not listed and argued in brief.").

Hartline testified at the Rule 32 hearing that he did not agree with Fricks's pursuit of what Hartline characterized as a "reasonable-doubt defense" because he believed that it "had almost no chance of being successful." (R. 132-33.)

After Brownfield was convicted and sentenced, Fricks and Hartline withdrew from representing him and new counsel were appointed to represent Brownfield on appeal. Appellate counsel filed a motion for a new trial, and the trial court conducted a hearing on that motion.

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The clothes, hammer, and knife were never recovered.

To the extent that Brownfield argues that counsel was ineffective for not retaining their expert on false confessions in a timely fashion, the record indicates that counsel did not become aware of the need for such an expert until after Dr. Lacy and Dr. Evans had evaluated Brownfield and that counsel then promptly requested funds for that expert in October 2003. However, the trial court denied the request, and it took counsel two more attempts over the next three months before the trial court finally authorized the funds less than a month before trial. "Trial counsel is not ineffective for having an objection overruled or a motion denied." Boyd v. State, 746 So.2d 364, 402 (Ala. Crim. App. 1999).

It is questionable whether expert testimony on false confessions would have even been admissible. See, e.g., Ray v. State, 80 So.3d 965, 991-92 (Ala. Crim. App. 2011).

We note that Brownfield asked Fricks and Hartline at the Rule 32 hearing why they did not seek to have Brownfield drug-tested after they were appointed, and both stated that it did not occur to them to request drug testing. However, Dr. Lipman testified that drugs dissipate from blood, saliva, sweat, or urine within approximately a week, and the record indicates that the last time Brownfield used any drugs was on December 23, 2001, that Fricks was not appointed to represent Brownfield until January 16, 2002, and that although Hartline was appointed to represent Brownfield on December 27, 2001, he did not receive notice of the appointment until January 3, 2002. Dr. Lipman also testified that, although evidence of drugs can remain in hair for at least six months, a drug test of hair will reveal only those drugs that are used chronically, not drugs that are used only one time. Specifically, Dr. Lipman testified that, even if counsel had requested that Brownfield's hair be tested for Xanax, the test would not have been positive because Brownfield had used Xanax only once. Dr. Lipman also said that, although a drug test on Brownfield's hair would likely have revealed his chronic use of methamphetamine and hydrocodone, it would not have revealed the amount of those drugs Brownfield had used.

At the time of the Rule 32 hearing, O'Steen's last name was Clark. To avoid confusion, we refer to her in this opinion as Priscilla O'Steen.

Brownfield introduced into evidence at the hearing all of the written psychological tests Dr. Rosenzsweig conducted and all the records she reviewed.